UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| KEITH THOMAS,<br><br>*Plaintiff,*<br><br>v.<br><br>UNITED PARCEL SERVICE, INC., KEITH REISEN, and JOHN DOES 1-10,<br><br>*Defendants.* | Civil Action No. 16-269<br><br>**OPINION** |

**John Michael Vazquez, U.S.D.J.**

In this case, *pro se* Plaintiff Keith Thomas alleges that his former employer, Defendant United States Parcel Service, Inc. ("UPS"), and his former manager, Defendant Keith Reisen, created a hostile work environment as well as discriminated and retaliated against Plaintiff because of Plaintiff's race. D.E. 1-1 at 6-11 ("Compl."). Currently pending are two motions for summary judgment brought pursuant to Fed. R. Civ. P. 56 by Defendants and Plaintiff.[1] D.E. 96, 103. The Court reviewed all submissions in support and in opposition,[2] and considered the motions without

---

[1] Plaintiff's motion is captioned "Motion for Breach of Contract and Perjury in Wrongful Termination" and does not cite a legal standard pursuant to which it is being brought. *See* D.E. 103, 103-1. The Court construes it as a motion for summary judgment pursuant to Fed. R. Civ. P. 56 given the stage of the proceedings.

[2] Defendants' brief in support of their motion for summary judgment will be referred to as "Def. Br.," D.E. 96-1; Plaintiff's oppositions and briefs in support of his motion will be referred to as "Pl. Br. 1, " D.E. 103, and "Pl. Br. 2," D.E. 103-1; Defendants' reply to Plaintiff's oppositions and opposition to Plaintiff's moving briefs will be referred to as "Def. Reply," D.E. 104.

oral argument pursuant to Fed. R. Civ. P. 78(b) and L. Civ. R. 78.1(b). For the following reasons, Defendants' motion for summary judgment is granted, and Plaintiff's motion is denied.

## I. BACKGROUND[3]

Plaintiff worked as a delivery driver for Defendant UPS from 1994 to his termination on October 18, 2013. Def. SOMF at 2, 7, 14. Over the 19 years, Plaintiff primarily serviced the same route in Paterson, New Jersey, and generally worked out of UPS's Saddle Brook Center (the "Center"). *Id.* at 2, 7. Defendant Keith Reisen managed the Center in the role of "Center Manager" from January 2010 through July 2015. Ryan Thibodeau held the management position above Reisen, the "Division Manager," during the pertinent time. *Id.* at 3. Approximately 33% of the 50 to 60 delivery drivers at the Center are minorities. *Id.* at 7. Both Reisen and Thibodeau are white. *Id.* at 7. Plaintiff is black. Compl. ¶ 1.

Plaintiff is a member of Local 177 ("L-177") of the International Brotherhood of Teamsters ("IBT") (collectively with L-177, the "Union"). Def. SOMF at 4. Accordingly, Plaintiff's employment with UPS was governed by two collective bargaining agreements (the "Agreements"): the National Master Agreement ("NMA") between UPS and IBT, and the Supplemental Agreement ("SA") between UPS and L-177. *Id.* at 5. UPS disciplines its Union employees in the form of warnings, suspensions, and discharge in accordance with the Agreements. *Id.* Plaintiff had a long record of disciplinary action throughout his 19-year career as a delivery driver, starting in 1997 and leading up to his termination in 2013. *Id.* at 7-12.

---

[3] The Court relies on Defendants' statement of undisputed material facts, D.E. 96-1 at 2-16 ("Def. SOMF"), to the extent that it is supported by the underlying exhibits. Plaintiff does not refute Defendants' statement of undisputed material facts. The Court also cites to underlying exhibits when necessary, such as previous arbitration decisions involving the parties. *See Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 60 (1974) (explaining that an arbitration decision may be "accorded such weight as the court deems appropriate.").

2

In 1997, Center Manager Joe Salinardi and Division Manager Peggy Emmart issued Plaintiff warnings for failure to follow instructions and failure to complete a work assignment (after failing to deliver 43 packages one day). *Id.* at 8. In 1998, Center Manager Julio Nieves issued Plaintiff a warning for failure to keep adequate records, Emmart issued Plaintiff seven different warnings for failure to follow various company protocols, and Emmart placed Plaintiff on notice of suspension, and later notice of discharge, for failure to follow these company protocols (such as continual failure to follow proper pick-up and delivery methods). *Id.* at 8.

In 2004, Division Manager Lou Rivieccio issued Plaintiff a warning for failure to complete his work assignment. *Id.* In 2010, Division Manager Michael Bach issued Plaintiff a warning for failure to remove clerical work from the vehicle at the end of the day, which followed with a warning from Division Manager Ron Mayorga two weeks later. *Id.* Division Manager Tim Rowe also issued Plaintiff a warning for failure to complete his dispatch and return to the building by the 8:00 p.m. curfew in 2010. *Id.* In 2011, Rowe placed Plaintiff on notice of discharge for unprofessional behavior and his overall work record, and later issued Plaintiff more warnings for failure to record his allotted lunch time and failure to adhere to delivery protocols. *Id.*

Seemingly the largest issue UPS management had with Plaintiff's job performance was the amount of "overallowed" time he accrued (leading to increased "overtime" hours), resulting mainly from Plaintiff's refusal to follow "trace" – a computer algorithm that predicts the most efficient order of deliveries. *Id.* at 4, 9-11. UPS uses trace to create a "planned day" for its drivers, meaning a predicted amount of time for a certain route. *Id.* at 4. "Overallowed" time is time the driver spends on his or her route in excess of the planned day. *Id.* "Overtime" is time the driver spends on his or her route in excess of the standard 8-hour workday. *Id.* at 9. Pursuant to the Agreements, Plaintiff received a rate of one and one-half times his regular pay for overtime hours.

3

*Id.* at 9. Thus, while overallowed hours and overtime hours are different concepts, more overallowed hours will lead to more overtime hours and, consequently, more pay. *Id.*

In February 2005 and March 2007, Plaintiff averaged 12.6 hours of overtime per week. *Id.* Plaintiff's manager then reduced his workload,[4] but Plaintiff still logged between 1.5-2.5 hours of overtime per day. *Id.* Plaintiff logged 632.19 hours of overtime in 2008, 530.12 hours of overtime in 2009, 532.41 hours of overtime in 2010, 765.25 hours of overtime in 2011, and 837.26 hours of overtime in 2012 – approximately 16 hours over overtime per week. *Id.* at 10. During this time, Plaintiff maintained the highest amount of overallowed hours for any driver in the Center, and at times, the State of New Jersey. *Id.* In other words, throughout these four years, Plaintiff consistently ranked among the most inefficient of UPS's drivers within the state and received more overtime pay as a result. *Id.*

In October 2012 Defendant Reisen met with Plaintiff and explained to him that his refusal to follow trace unnecessarily extended his workday and resulted in excessive overtime. *Id.* Defendant Reisen then reduced the number of stops on Plaintiff's route; however, this did not reduce Plaintiff's amount of overtime. *Id.* Throughout 2012, Plaintiff also received another warning and a notice of suspension for again failing to follow company protocol. *Id.* at 11. Then, from January 7, 2013 to August 20, 2013, Plaintiff received two written warnings, three notices of suspension, and three notices of discharge for failure to follow company protocol. *Id.* Plaintiff, through his Union, filed a grievance about the 2013 notices of suspension and discharge, resulting

---

[4] In 2007, Plaintiff filed suit against UPS for reducing his opportunity to earn overtime, alleging race discrimination, hostile work environment, retaliation, and intentional infliction of emotional distress. Judge Linares dismissed the suit on summary judgment. *Id.* at 9-10; *see Thomas v. United Parcel Service, Inc., et al.*, No. 07-05607 (D.N.J. Sept. 9, 2010).

4

in arbitration pursuant to the Agreements. *Id.*; *see* D.E. 96-12, Ex. E ("Weinstock Op."). While arbitration was pending, Plaintiff continued working. *Id.*

On April 12, 2014, Arbitrator Bonnie Weinstock issued an opinion on the three notices of suspension and three notices of discharge in 2013 (the "First Arbitration"). Weinstock Op. at 2. Weinstock noted that Plaintiff's "refusal to follow trace is a mystery," as Plaintiff "stubbornly did not follow trace and then became the employee with the greatest number of 'overallowed' hours." *Id.* at 3-4. Weinstock continued that "[t]his demonstrates that [Plaintiff] does *not* have a better way of working his route . . . [and] [i]n fact, the record evidence demonstrates that by failing to follow trace, [Plaintiff] returned to certain streets as many as five times in a day[.]" *Id.* at 4 (emphasis in original). Weinstock noted that "[c]learly, when [Plaintiff] ignores the Company's performance suggestions, he benefits himself with substantial daily overtime." *Id.* at 4-5. Thus, the Arbitrator found that Plaintiff "needs to learn the importance of following directions and needs to appreciate that additional discipline may result if he continues to fail to meet the Company's performance expectations." *Id.* at 4. Because Weinstock found that "the discipline was earned by [Plaintiff] due his obstinate refusal to follow Company directives and policies," Weinstock imposed a on Plaintiff "a thirty (30) calendar day suspension for repeated failures to meet performance expectations[.]" *Id.* at 8.

While the First Arbitration was underway, Plaintiff continued to work and accumulate disciplinary action. Def. SOMF at 12. On multiple dates in 2013 (September 4, 10, and 19, and October 1 and 7), UPS again placed Plaintiff on notice of discharge for failure to maintain his performance expectations. *Id.* In fact, between July and October 2013, Plaintiff's overtime remained consistent regardless of whether his route encompassed 70 stops or 100 stops. *Id.* To further demonstrate this anomaly, from January 2012 through fall of 2013, Plaintiff would average

5

up to five hours per day of overallowed hours, while drivers who substituted for Plaintiff on his route averaged just over 1.25 overallowed hours per day. *Id.* at 13.

In October 2013, UPS hired a private company, GRID Investigations ("GRID"), to observe Plaintiff's actions on the job. *Id.* GRID followed and observed Plaintiff during his delivery route on October 2 and 11. *Id.* GRID reported that Plaintiff engaged in a pattern of intentional delay, spending excessive time talking with customers and blatantly ignoring trace. *Id.* at 13-14. GRID also reported that Plaintiff falsified records by signing for packages himself rather than having customers sign for them and that Plaintiff failed to accurately document his delivery activities throughout the day. *Id.* On October 18, 2013, Defendant Reisen met with Plaintiff to discuss GRID's reports. *Id.* at 14. Finding that Plaintiff could not appropriately explain GRID's observations, UPS terminated Plaintiff for dishonesty, theft of time, driving excessive miles, unexplained time gaps, intentionally extending his day, and falsification of delivery and pickup records. *Id.* at 14.

Pursuant to the Agreements, Plaintiff and the Union challenged the discharge through arbitration (the "Second Arbitration"). *Id.* Under the Agreements, an arbitration decision "shall be final and be binding on the parties and the employees involved." D.E. 96-4 at 24. Arbitrator Melissa Biren presided over the Second Arbitration and held seven days of testimonial hearings, culminating in an Opinion and Award on September 19, 2014. Def. SOMF at 14; D.E. 96-12, Ex. F ("Biren Op."). Neither party objected to the fairness of the proceeding. Biren Op. at 2. From the testimonial hearing and GRID reports, Biren found that "UPS has proven the charges against Thomas, including, but not limited to dishonesty" and "[a]ccordingly, the Company had just cause for termination of Thomas' employment" under the Agreements. Biren Op. at 5. Biren noted that "Thomas admitted that he falsified company records" and that "[t]he evidence also supports the

6

conclusion that Thomas was intentionally extending his day so as to not reduce the amount of overtime he received," by "[i]n particular . . . ma[king] a conscious choice not to [follow trace]" despite "repeated directives" to do so. *Id.* at 7. Biren also found that "[t]he evidence does not support" Plaintiff's claims "that the discipline imposed . . . was the result of harassment and retaliation" or was "in any way racially motivated." *Id.* at 9. Specifically, Biren ended with the following:

> In conclusion, by his conduct as described above and in the charges, Thomas is guilty of dishonesty. His conduct was deliberate and intentional. His actions were designed not only to avoid detection and discipline for failing to comply with UPS methods and procedures, but also to assure that his [pay] was not reduced and that he continued to receive substantial overtime. Thus, by his dishonest conduct, Thomas realized significant personal financial benefit. Further, by his conduct, UPS' delivery records for Thomas' route were rendered inaccurate and unreliable as to the time and confirmation of delivery and as to Thomas' activities during the day. Such conduct cannot be excused or condoned.

*Id.* at 11. Accordingly, Biren denied Plaintiff's grievance and ruled that UPS had "just cause" for Plaintiff's termination. *Id.* at 12.

In October 2015, Plaintiff filed his Complaint in the Superior Court of New Jersey, alleging three causes of action: (I) hostile work environment in violation of New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-12 *et seq.*; (II) racial[5] discrimination in violation of NJLAD, N.J.S.A. 10:5-12 *et seq.*; and (III) retaliation in violation of NJLAD, N.J.S.A. 10:5-12 *et seq.* Compl. ¶¶ 15-28. Defendants removed the action on January 15, 2016 pursuant to 28 U.S.C. § 1441(a) on the basis of diversity jurisdiction, 28 U.S.C. § 1332(a).[6] D.E. 1 ("NOR") ¶ 9.

---

[5] The Complaint actually states "religious" discrimination, but both parties agree that this is an error. *See* Def. Br. at 16 n. 8.

[6] For purposes of diversity, Defendants assert that (a) Defendant UPS is an Ohio corporation with its principal place of business in Georgia, (b) Defendant Reisen is a New York citizen, and (c)

7

Defendants answered the Complaint on February 5, 2016, D.E. 5, and discovery ensued. On November 7, 2019, Defendants filed their current summary judgment motion. D.E. 96. On December 17, 2018, Plaintiff opposed Defendants' motion and filed his own motion for summary judgment. D.E. 103. Defendants then replied to Plaintiff's opposition and opposed Plaintiff's motion on January 10, 2019. D.E. 104.

## II. LEGAL STANDARD

A moving party is entitled to summary judgment where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact in dispute is material when it "might affect the outcome of the suit under the governing law" and is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Disputes over irrelevant or unnecessary facts will not preclude granting a motion for summary judgment. *Id.* "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the nonmoving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255)). In other words, a court's role in deciding a motion for summary judgment is not to evaluate the evidence and decide the truth of the matter but rather "to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249.

A party moving for summary judgment has the initial burden of showing the basis for its motion and must demonstrate that there is an absence of a genuine issue of material fact. *Celotex*

---

Plaintiff is a New Jersey citizen. NOR ¶¶ 7-9. Defendant also asserts that according to Plaintiff's alleged damages, the amount in controversy is over $75,000. *Id.* ¶ 9.

8

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After the moving party adequately supports its motion, the burden shifts to the nonmoving party to "go beyond the pleadings and by [his] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Id.* at 324 (internal quotation marks omitted). To withstand a properly supported motion for summary judgment, the nonmoving party must identify specific facts and affirmative evidence that contradict the moving party. *Anderson*, 477 U.S. at 250. "[I]f the non-movant's evidence is merely 'colorable' or is 'not significantly probative,' the court may grant summary judgment." *Messa v. Omaha Prop. & Cas. Ins. Co.*, 122 F. Supp. 2d 523, 528 (D.N.J. 2000) (quoting *Anderson*, 477 U.S. at 249-50)).

Ultimately, there is "no genuine issue as to any material fact" if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex Corp.*, 477 U.S. at 322. "If reasonable minds could differ as to the import of the evidence," however, summary judgment is not appropriate. *See Anderson*, 477 U.S. at 250-51.

### III. ANALYSIS

Plaintiff brings three claims under NJLAD: (I) hostile work environment, (II) racial discrimination, and (III) retaliation. Compl. ¶¶ 15-28. Defendants argue that Plaintiff fails to make a sufficient showing to establish the existence of essential elements of each claim. Def. Br. at 16-27. The Court agrees.

In reaching this conclusion, the Court relies, in part, on earlier arbitrations between the parties. While an arbitration decision on an employee's contractual rights under a collective bargaining agreement does not preclude the employee from vindicating additional rights in court (such as those provided by NJLAD), an arbitration decision may be "accorded such weight as the court deems appropriate." *Alexander*, 415 U.S. at 60.

Here, in the First Arbitration, "[p]rior to the conclusion of the hearing, [Thomas] was afforded the opportunity to add any comments to the record and he acknowledged that he had been given a full opportunity to present all relevant evidence." Weinstock Op. at 1. In the Second Arbitration, Biren heard seven days of testimony. Def. SOMF at 14; Biren Op. at 1. "[B]oth parties were given a full opportunity to present evidence, call witnesses and cross examine witness." Biren Op. at 1. "Four witnesses, including Keith Reisen, Ryan Thibodeau, Keith Thomas and David Bogeart testified." *Id.* "[N]umerous affidavits" were presented. *Id.* at 1-2. "[O]ver 80 separate exhibits were introduced into evidence and a lengthy video was viewed." *Id.* Again, neither party objected to the fairness of the proceeding. *Id.* at 2. Given these procedures, the Court finds the arbitrations to be reliable. Accordingly, Court affords them appropriate weight in evaluating the present motions.

Hostile Work Environment

Plaintiff first brings a claim for hostile work environment in violation of NJLAD, alleging that, "on account of [Plaintiff's] race," Defendants engaged in the following conduct, creating a hostile work environment: "repeatedly treating and speaking to [Plaintiff] in a demeaning and insulting fashion," (b) telling coworkers that Plaintiff is "lazy" or "should not be relied upon," (c) "discipline[ing] [Plaintiff] for things that other co-workers were allowed to do," (d) "requiring [Plaintiff] to carry out his duties in a more onerous way than other co-workers were required to do," (e) "negatively and unfairly evaluating [Plaintiff's] performance," and (f) "ultimately terminating Plaintiff's employment." Compl. ¶¶ 16-17.[7]

---

[7] Plaintiff does not clearly set forth his arguments for hostile work environment, racial discrimination, or retaliation in his opposition papers. Instead, Plaintiff focuses on alleged breaches of contract and perjury, *see* Pl. Br. 1; Pl. Br. 2, addressed below.

Under NJLAD, a plaintiff must prove the following for a hostile work environment race-based claim: "the complained-of conduct (1) would not have occurred but for the employee's [race]; and it was (2) severe or pervasive enough to make a (3) reasonable [person] believe that (4) the conditions of employment are altered and the working environment is hostile or abusive." *Lehmann v. Toys R Us, Inc.*, 132 N.J. 587, 603-04 (1993). Defendants argue, *inter alia*, that Plaintiff has failed to sufficiently establish the first element. Def. Br. at 20. The Court agrees.

Here, the record indicates that Defendants' conduct occurred not because of Plaintiff's race, but because of Plaintiff's recurrent refusal to adhere to company policies. First, Plaintiff admitted to falsifying company records, *see* Biren Op. at 5, justifying Defendants' comments that Plaintiff should not be relied on. Second, Plaintiff maintained the highest amount of overallowed hours for any driver at the Center, and at times, the State of New Jersey, Def. SOMF at 10, warranting more onerous supervision than his colleagues. Third, Plaintiff's replacement drivers consistently covered his routes in significantly less time, *id.* at 13, and GRID physically observed Plaintiff deviating from trace, *id.* at 13-14, warranting negative performance reviews and termination.

Additionally, Arbitrator Biren and Arbitrator Weinstock commented on Plaintiff's seemingly deliberate and intentional refusal to follow trace in order to secure more overtime pay. Biren Op. at 8; Weinstock Op. at 6. After a seven-day hearing, Arbitrator Biren, found that "[n]one of the actions that Thomas described as harassing during his testimony can be deemed inappropriate management conduct under the circumstances presented," and "[n]or does the evidence support that management's actions were in any way racially motivated." Biren Op. at 9. The Court agrees. The undisputed facts indicate that Defendants' conduct towards Plaintiff (including discipline and termination) occurred as a result of Plaintiff's own dishonest and

deficient job performance, not his race. Plaintiff has not presented any evidence that creates a genuine issue of material fact. The Court grants summary judgment to Defendants on Plaintiff's NJLAD hostile work environment claim.

Racial Discrimination and Retaliation

Plaintiff next alleges racial discrimination and retaliation in violation of NJLAD. Compl. ¶¶ 20-28. Specifically, Plaintiff alleges that "[b]y failing to equally apply rules between African American and Caucasian package car drivers," "providing [P]laintiff with routinely more work than Caucasian package car drivers," "imposing more onerous work requirements on Plaintiff than those imposed on his co-workers," "evaluating Plaintiff's work performance more harshly than his co-workers," and "ultimately terminating Plaintiff's employment," Defendants "discriminated against plaintiff on account of his race . . . in violation of NJLAD." Compl. ¶¶ 21-22. Additionally, Plaintiff alleges that "[i]n response to Plaintiff's complaints of harassment and discrimination[,] Defendants[s] retaliated against Plaintiff by increasing the harassment of him," "seeking to improperly discipline him," "giving him negative performance evaluations," and "ultimately terminating [him] . . . in violation of NJLAD." *Id.* ¶¶ 26-27.

"All retaliation and discrimination claims brought under . . . NJLAD, including those based on sex, race, and disability, which rely on circumstantial evidence, are controlled by the three-step burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973)." *Tourtellotte v. Eli Lilly & Co.*, 636 F. App'x 831, 841-42 (3d Cir. 2016); *see Viscik v. Fowler Equip. Co.*, 173 N.J. 1 (2002) (adopting the *McDonnell Douglas* framework for NJLAD employment discrimination cases). Under the *McDonnell Douglas* burden-shifting framework, (1) "the plaintiff first [must] establish a *prima facie* case of discrimination or retaliation"; (2) if the plaintiff does so, "the burden then shifts to the employer to articulate a legitimate, nonretaliatory

12

or nondiscriminatory reason for its actions"; and (3) if the employer does so, "the burden then shifts back to the plaintiff to prove that the employer's nonretaliatory or nondiscriminatory explanation is merely a pretext for the discrimination or retaliation." *Tourtellotte*, 636 F. App'x at 841 (citing *McDonnell Douglas Corp.*, 411 U.S. at 802-04). Here, Plaintiff fails to establish a *prima facie* case for either discrimination or retaliation.

First as to racial discrimination, under NJLAD, it is unlawful "[f]or an employer, because of the race . . . of any individual . . . to discriminate against such individual in compensation or in terms, conditions or privileges of employment." N.J.S.A. 10:5-12(a). To state a *prima facie* case for racial discrimination under NJLAD, a plaintiff must show that "(1) he is a member of a protected class, (2) he was performing his job at a level that met his employer's legitimate expectations, (3) he was terminated, and (4) he was replaced." *Bassett v. Rent-A-Ctr.*, 80 F. App'x 776, 778-79 (3d Cir. 2003) (citing *Clowes v. Terminix Int'l, Inc.*, 109 N.J. 575, 597 (1988)).

Here, Plaintiff fails to make a sufficient showing that he was performing his job at a level that met his employer's expectations. As explained above, Plaintiff falsified company records, accrued more overallowed hours than any of his colleagues, and refused to follow company protocol despite a myriad of warnings. Both Arbitrator Weinstock and Biren concluded that Plaintiff's job performance was deficient, warranting suspension and termination. Again, Plaintiff has not presented evidence that creates a genuine issue of material fact on this point. The Court grants summary judgment to Defendants on Plaintiff's NJLAD racial discrimination claim.

Turning to retaliation, to state a *prima facie* case for retaliation under NJLAD, "plaintiff must show that 1) [he or] she was engaged in a protected activity known to defendant; 2) [he or] she was thereafter subjected to an adverse employment decision by the defendant; and 3) there was a causal link between the two." *Royster v. New Jersey State Police*, 439 N.J. Super. 554, 575 (App.

Div. 2015) (quoting *Woods–Pirozzi v. Nabisco Foods*, 290 N.J. Super. 252, 274 (App. Div. 1996)), *aff'd as modified*, 227 N.J. 482 (2017). Plaintiff alleges that his protected activity was his "complaints of harassment and discrimination." Compl. ¶ 26.

Here, the undisputed facts do not demonstrate a causal link between Plaintiff's complaints of harassment/discrimination and Defendants' conduct of discipline/termination. Instead, as explained above, the undisputed facts show that Defendants' actions of disciplining and terminating Plaintiff were strongly supported by Plaintiff's deficient job performance. Two neutral arbitrators found the same. Plaintiff has not presented evidence that creates a genuine issue of material fact on this point. The Court grants summary judgment to Defendants on Plaintiff's NJLAD retaliation claim.[8]

Plaintiff's Motion

Plaintiff also brings a motion for summary judgment for breach of contract and perjury. D.E. 103. Neither of these claims are included in Plaintiff's Complaint. *See* Compl. A plaintiff "may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." *Bell v. City of Philadelphia*, 275 F. App'x 157, 160 (3d Cir. 2008). Therefore, the Court denies Plaintiff's motion.[9]

---

[8] Because the Court grants Defendants' motion for summary judgment for these reasons, the Court does not address the timeliness issue, but notes that a material dispute of fact may exist as to when the Complaint was actually filed. See Def. SOMF at 14 (arguing October 19, 2015); Compl. at 5 (indicating October 17, 2015).

[9] Additionally, the Court notes that Plaintiff's arguments for breach of contract (referring to the collective bargaining agreements) are the same issues adjudicated in the Second Arbitration. These claims cannot now be relitigated after the parties agreed to, and underwent, binding arbitration. *See Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 562 (1976) ("Courts are not to usurp those functions which collective-bargaining contracts have properly entrusted to the arbitration tribunal.") (quoting *Steelworkers v. American Mfg. Co.*, 363 U.S. 564, 569 (1960)) (internal quotations omitted).

14

## IV. CONCLUSION

In sum, Defendants' motion for summary judgment, D.E. 96, is granted. Plaintiff's motion, D.E. 103, is denied. Plaintiff's Complaint is dismissed with prejudice and this case is closed. An appropriate Order accompanies this Opinion.

Dated: August 12, 2019

John Michael Vazquez, U.S.D.J.